IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF WISCONSIN

---

ROGELIO LOPEZ,

                        Petitioner,

     v.

GREGORY GRAMS, Warden,
Fox Lake Correctional Center,

                        Respondent.

REPORT AND
RECOMMENDATION

08-cv-408-slc

---

REPORT

Before the court for report and recommendation is the petition for a writ of habeas corpus pursuant to 28 U.S.C. § 2254 brought by Rogelio Lopez, who is serving a life term of imprisonment as a result of his April 1999 conviction in the Circuit Court for Kenosha County on one count of first-degree intentional homicide by use of a dangerous weapon.  Lopez contends that his trial counsel was ineffective because he failed to call two witnesses at trial and did not stipulate to the admissibility of blood alcohol concentration reports.  Lopez also contends that statements he made were inadmissible because he was not given proper warnings under *Miranda v. Arizona*, 384 U.S. 436 (1966).  Finally, Lopez contends that his due process rights were violated because he was denied a fair trial.

As discussed below, none of these claims has merit and Lopez is not entitled to habeas relief from this court. I am recommending that his petition be dismissed.

I have drawn the following facts from the state court record:

FACTS

## I.  The Events Leading to Prosecution

In late April 1998, petitioner Rogelio Lopez, Juan Medina and Ubaldo Morales drank together at a bar in Kenosha for 3½ hours, leaving at 2:30 a.m. when the bar closed.  The three men left together in Lopez's Camaro.  Lopez and Morales got into an argument about Lopez's driving severe enough that both men stepped out of the car.  Lopez eventually returned to his car, while Morales began walking home.  Apparently not satisfied with this outcome, Lopez drove his car into Morales, popping him over the top of the car, then turned around and ran him over, killing him.

As Lopez and Medina drove off, Lopez lost control of the car and veered into a ditch, rolling the Camaro onto its side.  Medina cleared himself from the wreck, walked to a nearby house and in rough English asked the residents to call the police.  Kenosha County Deputy Sheriff Eric Klinkhammer came to the residence first and spoke to Medina in English, although Medina did not speak English well.  After this, Medina spoke in Spanish when interacting with law enforcement officers.

Nearer to the crash scene, Kenosha County Deputy Sheriff Timothy Krueger discovered Lopez conscious but lying face-down in tall grass as if he was hiding.  Deputy Krueger ordered Lopez up and Lopez obeyed.  Lopez was bleeding and smelled of alcohol.  Deputy Krueger handcuffed Lopez pending further investigation.  Because Lopez did not speak English, Krueger drove Lopez back to the accident scene where Wisconsin State Patrol Trooper David Torres acted as an on-the-scene Spanish interpreter.  At this point, the officers were treating this as a drunk driving investigation.  Torres asked Lopez to identify himself, asked whether the car keys

2

Deputy Krueger had taken from Lopez were his, and whether he knew the dead man.  Lopez responded that the keys were not his and that he did not know the dead man.

The officers took Lopez to a hospital for treatment.  There, Trooper Torres read Lopez his *Miranda* rights by translating an English wallet card into "street" Spanish. Lopez agreed to talk and provided his version of the events.  He admitted that the car keys were his but denied that that he drove the car or that he had any involvement with the victim.

Deputies took Lopez to the sheriff's department for booking.  Later that day, two detectives, using an interpreter, questioned Medina, who provided the version of events set forth above in the first two paragraphs of this fact section.  The detectives, again with their interpreter, questioned Lopez.  The interpreter read Lopez his *Miranda* rights in Spanish from a form written in Spanish.  Lopez signed a Spanish-language waiver and answered the detectives' questions for almost two hours.  At first Lopez claimed that only he and Medina had been in the car and that Medina was driving when they had an accident and rolled the car.  Confronted by the detectives with Medina's version of events, Lopez admitted that there was a third person in the car and that he had been driving, but that the only time the car stopped was when they had the accident.

## II.  Pretrial Proceedings

The state charged Lopez with first degree intentional homicide by use of his car as a weapon.  Lopez was represented by Attorney Jon G. Mason.  Assistant District Attorney Richard A. Ginkowski prosecuted the case.  Lopez, by counsel, moved to exclude evidence of Lopez's blood alcohol concentration at the time of the crime because the blood sample was not taken

within three hours, as required by state law.  Lopez also moved to exclude all three of his statements to the police on the ground that he had not received proper *Miranda* warnings.

On January 25, 1999, the Circuit Court for Kenosha County held a suppression hearing. The court held that unless an expert testified that Lopez's test result nonetheless had probative value, it was inadmissible.

The court then took evidence on the motion to suppress statements.  Deputy Krueger testified that he was dispatched to the scene to assist in a death investigation and was advised that an individual involved in the incident may be traveling on foot.  Krueger found Lopez lying down with his hands beneath his body.  Krueger testified that he drew his gun and ordered Lopez to show his hands.  Lopez stood up, and Krueger handcuffed him and placed him in the back of a squad car.  Krueger testified that because Lopez only spoke Spanish, he took Lopez into custody to identify him and determine if he had been involved in the incident.  He drove Lopez to the crime scene so Trooper Torres could act as an interpreter.  Krueger testified that Lopez was not under formal arrest at that time because the officers did not know what had happened. Lopez remained handcuffed in the back of the squad car during the questioning.

Trooper Torres testified that he asked Lopez his name, had him write it down on a piece of paper and clarified why he had multiple identification cards.  He then asked Lopez whether the keys that Deptuy Krueger had recovered from Lopez were his; he said that they were not. Trooper Torres asked Lopez if he knew the victim; Lopez said that he did not.

Deputy Krueger testified that he transported Lopez to the hospital, where he placed Lopez under arrest for hit and run-injury.  Deputy Krueger asked Trooper Torres to explain this to Lopez.  (Torres did not remember providing this explanation).  Trooper Torres testified that

4

at the hospital with Lopez he orally translated into Spanish a *Miranda* card written in English. Lopez appeared to understand the warnings and agreed to answer questions without a lawyer, remarking that "Lawyers aren't of any use anyway." Deputy sheriffs asked questions that Trooper Torres translated into Spanish for Lopez. Lopez now admitted that the car keys were his but continued to deny that he had been driving the car that night.

Torres testified that although he learned to speak Spanish at home, he never had formal training and does not know the rules of grammar. At the hearing, Mason had Torres translate the English *Miranda* warnings into Spanish. The court interpreter then translated the officer's Spanish back to English. The interpreter testified that Torres had advised Lopez that: he had the right to remain silent; anything he said could be used in court; he had the right to have a lawyer when they are asking questions; if he wanted a lawyer and could not pay for one, a lawyer would be appointed for him prior to questioning; and if he started to answer questions, he could stop at any time. In translating the document, Torres used the first person instead of the third person. The interpreter commented that although she understood what Torres was saying, the form of the Spanish and some of the words were not correct.

Later that same day (April 26, 1998) deputies took Lopez to the sheriff's department where he was questioned again. An interpreter read Lopez *Miranda* warnings in Spanish and Lopez signed a waiver form written in Spanish. Detectives Apker And Maegaerd questioned Lopez for about an hour and forty-five minutes, stopping when Lopez requested a lawyer. At first, Lopez denied being the driver of the car. After the Detectives played a tape of a portion of Medina's interview and accused Lopez of lying, he changed some of his story: he admitted

that he had been driving the Camaro and that the victim had been in the car, but he denied

stopping the car to let anyone out and denied hitting anyone with the car.

Based on this testimony, the court declined to suppress any of Lopez's statements. The

court found that Lopez had made his statement at the scene in an investigatory and not an

accusatory situation, and that *Miranda* warnings were not required. As for Lopez's statement

at the hospital, the court found that although Trooper Torres did not use polished Spanish, he

substantially communicated *Miranda* warnings to Lopez, who knowingly and voluntarily waived

his rights before answering questions.. Finally the court concluded that there was no dispute

that Lopez freely, knowingly and intelligently waived his *Miranda* rights at the jail, at least up

to a certain point, when the questioning stopped.


## III. Trial

At trial, Lopez's defense was that he had not been driving the car, but instead had been

a passenger.

The state called Medina, who testified that while Lopez drove him and Morales home

from the bar, Lopez and Morales argued about Lopez's driving. Medina testified that Lopez

stopped the car and Lopez and Morales got out. After a bit, Lopez got back in the car and

Morales started walking on the side of the road. Medina testified that Lopez hit Morales with

the car, backed the car up, drove forward and ran over Morales again before driving away. Soon

thereafter, Lopez crashed the car into a ditch. Dkt. 20 (Tab 78) at 50-70. On cross-

examination, Attorney Mason impeached Medina's credibility by asking him about deals he had

made with the prosecution for his testimony, his immigration status, his use of alcohol on the

night in question, inconsistencies between his testimony and prior statements and the fact that he lied about his name to the police.

Deputy Eric Klinkhammer testified that he was the first officer to arrive at the residence where Medina had gone after the accident. He testified that Medina responded to his questions in "fairly understandable English."

Trooper Torres testified to his Q&A with Lopez at the scene, during which Lopez denied that the keys to the Camaro recovered from him by Deputy Krueger were his. Trooper Torres testified about Lopez denying that he knew the victim:

> It was pretty straightforward. I asked him "do you know that guy over there" and pointed; and he kind of looked over in that direction and said, "What guy?" And I said, "the dead guy lying in the road." And then he said "What's his name?" and I said, "I don't know. That's what I'm asking you." and he said "No. I don't know him."

Trial Transcript, January 27, 1999, (Tab 79) at 38-40.

Trooper Torres also testified about interpreting Detective Maegaerd's interrogation of Lopez at the hospital, including providing Lopez with *Miranda* warnings in Spanish and obtaining a waiver, with Lopez commenting that lawyers weren't going to do him any good anyway. *Id.* at 23-24. Lopez now admitted that the car keys were his but still denied being the driver:

> [H]is statements were that he wasn't driving the vehicle, that a friend was driving it, and that he woke up, and he was alone. So he removed the keys from the vehicle and left the vehicle. . . . He [denied] having any involvement with the deceased.

Trial Transcript, January 27, 1999, (Tab 79) at 26.

The state also presented Lopez's third statement, through the detective's interpreter, Soledad Juarez. After reading Lopez his *Miranda* rights from a Spanish form and obtaining Lopez's signed waiver, Juarez interpreted the detectives' questions and Lopez's answers. Trial Transcript, January 28, 1999 (Tab 80) at 21-24. According to Juarez, Lopez initially claimed that he let his friend (Medina) drive home from the bar because Lopez did not have a driver's license, and that it was just the two of them in the car. When the detectives challenged this, Lopez admitted that maybe there had been a third person with him and that guy would have been in the car at the time of the rollover. Lopez denied driving and denied hitting anyone with the car. *Id.* at 27-28. Eventually, Lopez admitted that he had been driving, but claimed that the only time the car stopped was when it crashed. *Id.* at 36. Lopez continued to deny hitting anyone with his car or backing up his car. *Id.* at 37. The jury also heard this set of questions and answers during the cross-examination by Lopez's attorney:

> Q:    But despite the fact that he was called a liar by these detectives, [Lopez] insisted that he never ran over anyone either accidentally or intentionally, correct?
>
> A:    Yes.

The interpreter testified that when the detectives played a portion of their interrogation of Medina, Lopez responded that Medina was lying. The interpreter did not recall the detectives asking Lopez why he had provided two different versions of events. *Id.* at 40.

The state also presented testimony from law enforcement and medical witnesses reconstructing the events of that evening. Their testimony coalesced into a view that the victim had been struck twice by the Camaro, the first time being tossed over the car, breaking the rear window when he landed on it, the second time having his skull crushed by a wheel.

8

After hearing argument from Attorney Mason, the trial court rejected Lopez's request to instruct the jury on the lesser charge of reckless homicide. The court found that there was no evidence to support a conviction on this charge. Tab 81 at 10-11.

The jury found Lopez guilty of first degree intentional homicide while using a dangerous weapon. *Id.* at 71.

## IV. Postconviction Proceedings

Seven years after he was convicted, Lopez brought a motion for postconviction relief, arguing that he was entitled to a new trial, his trial attorney, Mason, had been ineffective and that Lopez's sentence was too harsh. On February 9, 2005, the court held a *Machner* hearing[1] on Lopez's claim of ineffective assistance of counsel. Attorney Andrew Franklin represented Lopez at the hearing. Mason testified that Lopez denied driving the vehicle and that Medina's credibility was a major issue. Attorney Franklin did not ask Mason why he did not call as witnesses the occupants of the house to which Medina went for help (Tammy Covelli and Matthew Lubenstein) to establish that Medina had spoken to them in English.

But Attorney Franklin did elicit testimony from Covelli at the *Machner* hearing. She testified that in the early morning of April 26, 1998, Juan Medina knocked on her door and asked her to call the police because he had been in an accident with his cousin. She testified that he spoke in rough English. Covelli stated that she did not have a two-way conversation with Medina and although she had trouble understanding him, she could make out his requests for

_____

[1] *State v. Machner*, 92 Wis. 2d 797, (Wis. Ct. App. 1979)

9

help because she works with the public.  Lubenstein also testified at the *Machner* hearing, recalling that Medina spoke English and that Lubenstein did not have trouble understanding him.  Lubenstein testified that Medina spoke Spanish to the police.

The court found that Attorney Mason had not been ineffective at trial.  Although Attorney Mason had not called Covelli and Lubenstein as witnesses to impeach Medina by showing that he spoke English, Mason had spent a lot of time attacking Medina's credibility and attempting to establish a theory of defense.  The court also concluded that Lopez's sentence was fair and appropriate.

## V.  Appellate Proceedings

Lopez appealed his judgment of conviction and the order denying his motion for postconviction relief.  Lopez argued that Attorney Mason had been ineffective at trial because: (1) He did not call Covelli and Lubenstein as witnesses to impeach Medina; and  (2) he should have  stipulated to the admissibility of the blood alcohol concentration reports (as opposed to seeking their suppression).  Lopez also argued that the trial court should have suppressed his statements to the police.

On December 27, 2006, the Wisconsin Court of Appeals affirmed Lopez's conviction and sentence in an unpublished decision. *See* dkt. 18, Pt. 7, Exh. J.  In considering Lopez's ineffective assistance of counsel claims, the court applied the two part test set forth in *Strickland v. Washington,* 466 U.S. 668, 690 (1984).  The first considered and rejected Lopez 's assertions regarding Covelli and Lubenstein.  First, the court stated that it could not conclude that Attorney Mason had been ineffective for failing to call these witnesses because Attorney Franklin

had not questioned him about this at the *Machner* hearing, thus depriving Attorney Mason of an opportunity to explain his thought process. More fundamentally, the court found that the witnesses' testimony would not have impeached Medina significantly. The court noted that one of the witnesses testified at the postconviction hearing that Medina's English was "rough." The court further stated that it was not surprising that a person fluent in Spanish would speak English in a crisis situation in which he was seeking help from English-speaking people.

Lopez fared no better with his claim regarding the evidence of his blood alcohol concentration reports, which he claimed would have explained some of his statements at the scene and also provided a basis for the lesser-included offense of reckless homicide. The appellate court disagreed, observing that offering the BAC evidence could have contradicted Lopez's theory of the defense that he was not driving the car. As a result, the court of appeals found that Attorney Mason was not ineffective for moving to suppress this evidence.

Next, Lopez argued that the trial court improperly admitted three statements he made that were taken in violation of his *Miranda* rights. Lopez argued that his *Miranda* rights were not properly translated into Spanish and that his subsequent statement made after he was given properly translated rights must be excluded as a fruit of the poisonous tree. The court of appeals agreed with the trial court that Lopez's first, un-*Mirandized* statement made to the officers on the scene was admissible because the officers were not required to *Miranda* Lopez before asking him general fact-finding questions about "the body on the road, . . . the car in the ditch, and a man lying in tall grass." The court also concluded that Lopez "was not in custody at the time the questions were asked." *See* dkt. 18, Exh. 7 at ¶ 13.

11

As for Lopez's statements during questioning at the hospital, the court found that Lopez had received adequate *Miranda* advisals and then had voluntarily waived those rights.  Citing *State v. Santiago*, 206 Wis. 2d 3, 556 N.W.2d 687 (Wis. 1996) and *California v. Prysock*, 453 U.S. 355, 359 (1981), the court determined that the circuit court properly had assessed whether Trooper Torres adequately translated the warnings into Spanish.  The court noted that Lopez's statement that "Lawyers aren't of any use anyway" indicated that he understood and was waiving his *Miranda* rights.

Lopez argued that the statement that he made at the sheriff's department was inadmissible because his previous statements were tainted.  The appellate court reasoned that because it had found that the prior statements had no taint, the statement at the sheriff's department was constitutional.  The court further held that Lopez received additional *Miranda* warnings, signed a valid waiver of his rights and the police stopped questioning him when he later requested an attorney.

Finally, the court of appeals addressed Lopez's generic argument that he was entitled to a new trial in the interest of justice.  The court concluded that he was not entitled to a new trial because his challenges were meritless.

The Wisconsin Supreme Court denied Lopez's petition for review on April 17, 2007.


ANALYSIS

**I.  Procedural Default**

In his supplemental petition, dkt. 8, Lopez appears to argue that he was denied a fair trial in violation of his due process rights because of all the errors committed by the circuit court and

his attorney at trial.  But during his state appeal, Lopez argued only that he was entitled to a new trial in the interest of justice.  The state asserts that because Lopez never brought a due process claim in state court, he has defaulted it.

A habeas petitioner must "fairly present" his claims to the state courts.  *Duncan v. Henry*, 513 U.S. 364, 366 (1995) (per curiam); *Chambers v. McCaughtry*, 264 F.3d 732, 737 (7th Cir. 2001)*; see also O'Sullivan v. Boerckel*, 526 U.S. 838, 845 (1999) ("[T]he exhaustion doctrine is designed to give the state courts a full and fair opportunity to resolve federal constitutional claims before those claims are presented to the federal courts.").  That is, "[a] petitioner must provide the state courts with a fair opportunity to apply constitutional principles and correct any constitutional error committed by the trial court."  *Bocian v. Godinez*, 101 F.3d 465, 469 (7th Cir. 1996) (quotation omitted).  In order to meet the "fair presentment" precondition to exhaustion, "[t]he petitioner must have placed both the operative facts and the controlling legal principles before the state courts."  *Chambers,* 264 F.3d at 737-38 (internal citations omitted). "A mere passing reference to a constitutional issue certainly does not suffice."  *Id*. at 738.  A petitioner's failure to fairly present his federal claims to the state courts is a procedural default that bars this court from considering the merits of the claims.  *Id*.

Courts should consider four factors in deciding whether a petitioner has fairly apprised the state courts of the constitutional nature of his claim:  1) whether the petitioner relied on federal cases that engage in a constitutional analysis; 2) whether the petitioner relied on state cases which apply a constitutional analysis to similar facts; 3) whether the petitioner framed the claim in terms so particular as to call to mind a specific constitutional right; and 4) whether the petitioner alleged a pattern of facts that is well within the mainstream of constitutional

litigation. *Anderson v. Benik*, 471 F.3d 811, 815 (7th Cir. 2006) (citations omitted). However, mere similarity of state and federal claims is not enough to exhaust. *Duncan*, 513 U.S. at 366. As the Supreme Court has explained, "[i]f a habeas petitioner wishes to claim that an evidentiary ruling at a state court trial denied him the due process of law guaranteed by the Fourteenth Amendment, he must say so, not only in federal court, but in state court." *Id.; see also Baldwin v. Reese*, 541 U.S. 27, 32 (2004) ("A litigant wishing to raise a federal issue can easily indicate the federal law basis for his claim in a state court petition or brief, for example, by citing in conjunction with the claim the federal source of law on which he relies or a case deciding such a claim on federal grounds, or by simply labeling the claim 'federal.'").

On appeal in state court, Lopez threw in a cursory "interests of justice" claim apparently as a catch-all safety net. He did not refer to any federal cases or law that would have alerted the court that Lopez intended to pursue a federal due process claim. As a result, Lopez did not properly raise his federal constitutional claim in state court and now is barred from raising it during federal habeas review.

Even so, a petitioner who has procedurally defaulted a claim may overcome the bar by showing 1) cause for the default and actual prejudice from failing to raise the claim as required, or 2) that enforcing the default would lead to a "fundamental miscarriage of justice." *Steward v. Gilmore*, 80 F .3d 1205, 1211-12 (7th Cir. 1996) (quoting *Wainwright v. Sykes*, 433 U.S. 72, 87 (1977)). To meet the "cause" requirement, there must have been some external impediment that prevented petitioner from raising the claim. *Murray v. Carrier*, 477 U.S. 478, 488 (1986). A fundamental miscarriage of justice is established by demonstrating that it is more likely than not that no reasonable juror would have convicted petitioner in light of any new evidence.

14

*Schlup v. Delo*, 513 U.S. 298, 327 (1990). Lopez has not attempted to show that he meets either exception and nothing in the record suggests that he possibly could do so.

Finally, if Lopez is inviting this court to exercise its discretionary reversal power and find that the state court erred by not providing him with a new trial in the interest of justice, such a claim is not cognizable in a petition for a federal writ of habeas corpus. *Herrera v. Collins*, 506 U.S. 390, 400 (1993) ("federal habeas courts sit to ensure that individuals are not imprisoned in violation of the Constitution—not to correct errors of fact") (citations omitted); *In re Terry*, 128 U.S. 289, 305 (1888) ("the writ of habeas corpus does not perform the office of a writ of error or an appeal").

## II.  Merits

### A.  Legal Standard

Federal courts may grant a state prisoner habeas relief only if the state courts' adjudication of the claim:

> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
>
> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d).  To grant habeas relief under the "contrary to" clause, a federal court must find that the state court reached a result opposite to that reached by the Supreme Court on materially indistinguishable facts. *Williams v. Taylor*, 529 U.S. 362, 405 (2000); *Jackson v. Miller*, 260 F.3d 769, 774 (7th Cir. 2001).  To obtain relief under the "unreasonable application"

clause, a habeas petitioner must show that the state court's decision unreasonably extended a clearly established Supreme Court precedent to a context where it should not have applied or unreasonably refused to extend such precedent to a context where it should have applied. *Jackson*, 260 F.3d at 774.  A state court's factual findings are presumed correct unless the petitioner presents clear and convincing evidence showing that the findings were wrong.  28 U.S.C. § 2254(e)(1).  To prevail on this prong, a petitioner must show that the state court's decision was so erroneous as to be objectively unreasonable, that is, well outside the boundaries of permissible differences of opinion.  *Emerson v. Shaw*, 575 F.3d 680, 684 (7th Cir. 2009).

### B.  Ineffective Assistance of Counsel

Lopez asserts that his trial lawyer, Mason, was ineffective because he failed to call two witnesses and to stipulate to the admissibility of the blood alcohol concentration report.  Lopez does not dispute the state court of appeals's determination of the facts but contends that it unreasonably applied clearly established law.

Lopez's ineffective assistance of counsel claims are controlled by the two-part test set forth in *Strickland v. Washington*:  First, Lopez must show that his trial counsel's performance fell below an objective standard of reasonableness.  A court's review of counsel's performance is highly deferential, presuming reasonable judgment and declining to second-guess strategic choices.  *Strickland*, 466 U.S. at 689; *Kimmelman v. Morrison*, 477 U.S. 365, 381 (1986); *United States v. Williams*, 106 F.3d 1362, 1367 (7th Cir. 1997).  Second, Lopez must show that he was prejudiced by counsel's errors.  To establish prejudice, "[t]he defendant must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the

16

proceeding would have been different.  A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Strickland*, 466 U.S. at 694; *see also Gross v. Knight*, 560 F.3d 668, 672 (7th Cir. 2009) ("reasonable probability" is a "better than negligible" chance).

On habeas review, the bar is even higher: Lopez must do more than show that he would have satisfied *Strickland*'s test if his claim were being analyzed in the first instance; he must show that the state courts applied *Strickland* to the facts of his case in an objectively unreasonable manner.  *Bell v. Cone*, 535 U.S. 685, 698-99 (2002).  Showing that a state court applied *Strickland* unreasonably is extraordinarily difficult because *Strickland* calls for inquiry into degrees. This means that only a clear error in applying *Strickland*'s standard will support a writ of habeas corpus.  *Holman v. Gilmore*, 126 F.3d 876, 882 (7th Cir. 1997); *see also Knowles v. Mirzayance*, ___ U.S. ___, 129 S.Ct. 1411, 1420 (2009) ("the question is not whether a federal court believes that the state court's determination under the *Strickland* standard was incorrect but whether that determination was unreasonable—a substantially higher threshold").

In this case, the court of appeals stated that it could not find that Attorney Mason's impeachment of  Medina was deficient– that is, not strategic– because at the *Machner* hearing, Mason was not given the opportunity to explain his decision not to call Covelli and Lubenstein as witnesses at trial.  Although it didn't have to, the court went further,  finding that even if these witnesses had testified that Medina had spoken to them in English in contradiction of Medina's later assertion that he did not speak English, this testimony would not have seriously impeached Medina.  The court explained that Medina's English was "rough" and that it was not surprising that even though Medina was fluent in Spanish, he attempted to speak in English when seeking help from English-speaking people.  Although the court of appeals did not

17

specifically articulate how it applied *Strickland*, it is reasonable to infer that the appellate court determined that even if Mason's performance was deficient, the result of the trial would not have been different.[2]

The trial court concluded after the *Machner* hearing that Attorney mason had energetically attacked Medina's credibility. The trial transcript confirms the court's conclusion. Mason questioned Medina about other lies that he allegedly told the police. As respondent notes, Mason presented *other* evidence at trial that Medina spoke in English on the night of the incident: Deputy Klinkhammer testified that Medina spoke in fairly understandable English when he was interviewed at the Covelli residence. Testimony from Covelli or Lubenstein on this same point would have been cumulative. In sum, the court of appeals did not reach a decision contrary to or involving an unreasonable application of *Strickland* with respect to Mason's decision not to call Covelli and Lubenstein as witnesses.

The court of appeals also reasonably applied *Strickland* in determining that Mason was not ineffective when he moved to suppress the reports of Lopez's blood alcohol concentration. The state appellate court rejected Lopez's argument that this evidence would have explained some of his conduct and statements at the scene and provided a basis for the lesser-included offense of reckless homicide. The court noted that Lopez failed to explain his argument, cite any law in support or indicate how the evidence would have changed the outcome of the case. The court of appeals also concluded that any evidence supporting a lesser-included offense would

---

[2] It would seem that extrinsic impeaching evidence of this sort would have been barred by Wis. Stat. Sec. 906.08(2) (equivalent to F.R.Ev. 608(b)), and probably also barred by Wis. Stat. Sec. 904.03 (equivalent to F.R.Ev. 403) but this never came up at the state appellate level. These evidentiary rules resonate sufficiently with this court to support the conclusion that Attorney Mason cannot be found ineffective for failing to offer two cumulative, tangential impeachment witnesses.

have contradicted the theory of the defense that he was not driving the car by suggesting that Lopez was driving while intoxicated.  As such, the court found that counsel was not ineffective for moving to suppress this evidence.

The Supreme Court has held that a defendant is entitled to an instruction on a lesser included offense only "if the evidence would permit a jury rationally to find him guilty of the lesser offense and acquit him of the greater." *Keeble v. United States*, 412 U.S. 205, 208 (1973); *see also Armstrong v. Bertrand*, 336 F.3d 620, 625 (7th Cir. 2003) (citing same in § 2254 case). The same rule applies in Wisconsin. *Nichols v. Gagnon*, 710 F.2d 1267, 1269 (7th Cir. 1983); *State v. Wilson*, 149 Wis. 2d 878, 898, 440 N.W.2d 534 (1989); *Leach v. State*, 83 Wis. 2d 199, 216-17, 265 N.W.2d 495, 503 (1978).  Like in the state court of appeals, Lopez did not make any legal argument related to this claim in his federal habeas petition, the supplement to the petition or his supporting brief.  In other words, he has failed to show that the mere fact that he was intoxicated would allow a jury to find him guilty of reckless homicide under Wisconsin law.  Because Lopez has not developed his argument in any meaningful way, he has waived it. *Campania Management Co., Inc. v. Rooks, Pitts & Poust*, 290 F.3d 843, n. 6 (7th Cir. 2002) ("Perfunctory and undeveloped arguments are waived").

However, even if the Lopez's intoxication would have helped steer the jury toward a lesser included offense with a lower mens rea requirement, Lopez has not shown that Mason acted deficiently in excluding the blood alcohol test results.  As the state appellate court noted, Lopez's defense was that he was not driving the car and that Medina was a liar for saying that he was. Tactically, it was beneficial to this defense to exclude evidence of Lopez's BAC in order to make his recollection of events seem more credible to the jury.

If Lopez were to advocate reckless homicide to the jury as a more rational charge on which to convict him than intentional homicide, Lopez would have to concede that he was driving. This would have undermined the factual centerpiece of Lopez's defense to the intentional homicide charge, namely that Medina was lying. If Lopez was driving, then there was no need for Medina to lie about what happened.

It also would this have put Lopez in the awkward position of advocating conflicting factual theories to the jury ("I wasn't driving, but if you find that I was, I was drunk"). Arguing that Lopez was drunk and therefore did not have the intent to kill Morales was a possible trial strategy; indeed, Attorney Mason requested a lesser offense instruction to this effect only to be rebuffed by the court. But clearly this was Attorney Mason's fallback position in the event that the jury found Medina credible.[3] This frames a quintessentially tactical decision for a criminal defense attorney: do you seek exclusion of the BAC evidence in order to pursue the primary defense wholeheartedly, or do you hedge your bets by not contesting the BAC evidence, thereby undercutting the primary defense while bolstering the weaker secondary defense? Either decision presents competing risks and rewards. *Strickland* makes clear that these sorts of tactical decisions cannot be second-guessed. The state court's decision that Lopez failed to show that Mason acted deficiently, or that the outcome of the trial would have been different if the blood alcohol evidence had been admitted was not unreasonable.

---

[3]  Keep in mind that the forensic evidence showed that the Camaro had hit the victim twice, undermining any claim of an unintentional killing. Lopez's best chance at acquittal was raising a doubt as to who had been driving.

### C.  Admissibility of Statements

_____Lopez contends that the three statements he made to the police on the night of the incident were inadmissible because he was not given proper *Miranda* warnings.  In *Miranda*, the Supreme Court held that "the prosecution may not use statements, whether exculpatory or inculpatory, stemming from custodial interrogation of the defendant" unless the defendant is informed prior to any questioning "that he has a right to remain silent, that any statement he does make may be used as evidence against him, and that he has the right to the presence of an attorney."  *Miranda*, 384 U.S. at 444.  The "suspect must be both 'in custody' and subjected to 'interrogation' before the *Miranda* warning are required to be administered."  *U.S. v. Barker*, 467 F.3d 625, 469 (7th Cir. 2006); *United States v. Abdulla*, 294 F.3d 830, 834 (7th Cir. 2002).

The court of appeals found that because Lopez's first statement was made when the officers were conducting general fact-finding and not while he was in custody, the *Miranda* warnings were not required.  "A custodial interrogation occurs when there is 'questioning initiated by law enforcement officers after a person has been taken into custody or otherwise deprived of his freedom of action in any significant way.'" *Barker*, 467 F.3d at 629 (quoting *Miranda*, 384 U.S. at 444).  Although the state court found that Lopez was not in custody when Torres asked him about his identity and whether he knew the victim, I am not convinced.

After finding Lopez lying in the grass, Deputy Krueger drew his firearm, handcuffed Lopez and placed him in the back of the squad car.  Both Krueger and Torres testified that Lopez was not under arrest or even suspected of wrongdoing at that time.  However, "[a] policeman's unarticulated plan has no bearing on the question whether a suspect was 'in custody' at a particular time; the only relevant inquiry is how a reasonable man in the suspect's

21

position would have understood his situation." *Berkemer v. McCarty*, 468 U.S. 420, 442 (1984). *See also United States v. Smith*, 3 F.3d 1088, 1096-97 (7th Cir. 1993) (determining whether a suspect was in custody for *Miranda* purposes is a narrower and stricter analysis than determining whether a suspect was in custody for Fourth Amendment purposes). A reasonable person in Lopez's position would have believed that he was not free to leave.  Therefore, Lopez was in custody for *Miranda* purposes.

Nonetheless, even if the state court erred in concluding that Lopez was not in custody, *most* of Trooper Torres's questions about Lopez's and the victim's identity did not constitute an interrogation.  In *Rhode Island v. Innis*, 446 U.S. 291, 300-01 (1980), the Supreme Court stated that "interrogation" means "any words or actions on the part of the police (other than those normally attendant to arrest and custody) that the police should know are reasonably likely to elicit an incriminating response from the suspect."  Most of Torres's questions were intended to elicit basic facts concerning Lopez's identity and the identity of the dead man lying in the road. An objective observer would not believe that the questions about Lopez's and Morales's identities were reasonably likely to elicit an incriminating response.  *U.S. v. Westbrook*, 125 F.3d 996, 1002 (7th Cir. 1997) (noting brief informational questions about identity of defendant or identity of others in room at time suspect arrested are not interrogation). On the other hand, asking Lopez whether the keys in the car were his, while perhaps intended as background investigation, nonetheless qualifies as interrogation under federal law. *see Orozco v. Texas*,  394 U.S. 324, 325-26 (1969); *United States v. Smith*, 3 F.3d at 1098.  This means that Lopez was subjected to a one-question custodial interrogation without having been advised of his *Miranda*

rights, and that his answer to the improper question about the car keys should not have been admitted at trial.

Because the state courts found no error on this point, they never performed a harmlessness analysis, which leaves the task to this court. *See Smiley v. Thurmer*, 542 F.3d 574, 583-84 (7th Cir. 2008). The question is whether the erroneous admission of Lopez's false denial that the car keys were his had a substantial and injurious effect or influence in determining the jury's verdict. *Fry v. Pliler*, 551 U.S. 112, 121-22 (2007), *citing Brecht v. Abrahamson*, 507 U.S. 619, 637 (1993). Because the trial was essentially a referendum on the truthfulness of Lopez compared to Medina, this court must remain sensitive to the impact of any improperly admitted impeachment evidence. *Smiley*, 542 F.3d at 584-85.

Even so, allowing the jury to hear Lopez's first statement to Trooper Torres about his car keys was harmless. Within an hour, at the hospital, Lopez had admitted that the keys were his and explained that he had taken them from the ignition after Medina had crashed Lopez's car into the ditch. The car key denial was an inconsequential lie that faded to insignificance when Lopez, during his properly *Mirandized* and properly-interpreted interrogation by the detectives, Lopez initially stuck with his two big lies (the victim was not in the car and Lopez was not the driver), then caved in and admitted that the victim *had* been in the car and that Lopez *had* been driving.[4] This bit of testimony included the interpreter reporting during cross-examination that the detectives had repeatedly called Lopez a liar. Trooper Torres testified at trial that Lopez also

---

[4] At trial Lopez, by counsel, returned to his first story, that Medina had been driving.

lied to the officers at the hospital after he had received his *Miranda* warnings.  Against all this, Lopez's improperly admitted lie about the car keys dwindles to insubstantiality.

Lopez argues that the statement he made to Torres at the hospital should not have been admitted because he was not properly advised of his *Miranda* warnings in Spanish.  Relying on *State v. Santiago*, 206 Wis. 2d 3, 18-19, 556 N.W.2d 687, 692-93 (Wis. 1996), the court of appeals found that the translation that Lopez received was adequate and that his statement that "Lawyers aren't of any use anyway" showed that he understood the instruction and waived his rights.  Although *Santiago* is a state case, the Wisconsin Supreme Court in *Santiago* applied federal law in holding that the accused be adequately informed of his *Miranda* rights, understand them and knowingly and intelligently waive them.  *Id.* (citing *Moran v. Burbine*, 475 U.S. 412, 421 (1986) ("[T]he waiver must have been made with a full awareness of both the nature of the right being abandoned and the consequences of the decision to abandon it.")).  The U.S. Supreme Court has noted that it has never found "any desirable rigidity in the form of the required warnings" and indicated in *Miranda* that "no talismanic incantation was required to satisfy its strictures."  *California v. Prysock*, 453 U.S. 355, 359 (1981).

Torres's translation of the English *Miranda* warnings into Spanish was tested at the *Miranda-Goodchild* hearing.  According to the court interpreter, although Torres's Spanish was far from perfect, she understood him to say that Lopez had the right to remain silent; anything he said could be used in court; he had the right to have a lawyer when they are asking questions; if he wanted a lawyer and could not pay for one, a lawyer would be appointed for him prior to questioning; and if he started to answer questions, he could stop at any time.  Even though these warnings do not repeat verbatim those set forth in *Miranda*, they are essentially the same and

24

reasonably convey the substantive meaning of the rights.  *Duckworth v. Eagan*, 492 U.S. 195, 202-03 (1989) ("We have never insisted that *Miranda* warnings be given in the exact form described in that decision.").  I also agree that Lopez's statement about lawyers indicates that he understood his rights and intended to waive them.  The state court's admission of the statement that Lopez made at the hospital was not contrary to clearly established federal law.

Although on appeal, Lopez did not challenge the adequacy of the *Miranda* warning translated for him at the sheriff's department, he argued that his subsequent statement should be suppressed as fruit of the poisonous tree because his previous statements were tainted.  The appellate court reasoned that because it had found that the prior statements had no taint, the statement at the sheriff's department was constitutional.  The court further held that Lopez received additional *Miranda* warnings, signed a valid waiver of his rights and the police stopped questioning him when he later requested an attorney.  With one small exception, this all constitutes a reasonable application of federal law with respect to the statement made at the sheriff's department.  However, because Trooper Torres's on-the-scene question about the car keys was improper, this court must perform a taint analysis pursuant to *Oregon v. Elstad*, 470 U.S. 298 (1985).  There is no evidence that Lopez's answer to this question was involuntary, and Lopez made all of his subsequent statements knowingly and voluntarily at different locations, at different times, and after receiving adequate *Miranda* advisals and waiving his rights.  Therefore, whatever minimal taint resulted was attenuated.  *Id.* at 318.[5]

---

[5] This same analysis would apply and would lead to the same result in the event Trooper Torres's questions about the identity of the victim are deemed to violate *Miranda*.  In the event a *Brecht* analysis also is deemed necessary for this set of questions, admission of Lopez's initial denial could not have had a substantial injurious effect on the jury's deliberations given his subsequent affirmation of this lie in his admissible statements followed by his 180 degree switch during his third interrogation.

RECOMMENDATION

Pursuant to 28 U.S.C. § 636(b)(1)(B) and for the reasons stated above, I recommend

that the petition of Rogelio Lopez for a writ of habeas corpus be DENIED.


Entered this 11th day of November, 2009.

BY THE COURT:

/s/

STEPHEN L. CROCKER
Magistrate Judge

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WISCONSIN
120 N. Henry Street, Rm. 540
Post Office Box 591
Madison, Wisconsin  53701

Chambers of                                                                                    Telephone
STEPHEN L. CROCKER                                                                   (608) 264-5153
U.S. Magistrate Judge

November 13, 2009

Rogelio Lopez
Reg. No. 366487
Columbia Correctional Institution
P.O. Box 900
Portage, WI 53901-0900

Warren D. Weinstein
Wisconsin Department of Justice
P.O. Box 7857
Madison, WI 53707-7857

      Re: ___ Lopez v. Gram
           Case No. 08-cv-408-slc

Dear Counsel:

      The attached Report and Recommendation has been filed with the court by the United States Magistrate Judge.

      The court will delay consideration of the Report in order to give the parties an opportunity to comment on the magistrate judge's recommendations.

      In accordance with the provisions set forth in the memorandum of the Clerk of Court for this district which is also enclosed, objections to any portion of the report may be raised by either party on or before November 24, 2009, by filing a memorandum with the court with a copy to opposing counsel.

      If no memorandum is received by November 24, 2009, the court will proceed to consider the magistrate judge's Report and Recommendation.

                 Sincerely,

                  /s/

                 Connie A. Korth
                 Secretary to Magistrate Judge Crocker

Enclosures
cc:   Honorable Barbara B. Crabb, District Judge

MEMORANDUM REGARDING REPORTS AND RECOMMENDATIONS

Pursuant to 28 U.S.C. § 636(b), the district judges of this court have designated the full-time magistrate judge to submit to them proposed findings of fact and recommendations for disposition by the district judges of motions seeking:

> (1) injunctive relief;
>
> (2) judgment on the pleadings;
>
> (3) summary judgment;
>
> (4) to dismiss or quash an indictment or information;
>
> (5) to suppress evidence in a criminal case;
>
> (6) to dismiss or to permit maintenance of a class action;
>
> (7) to dismiss for failure to state a claim upon which relief can be granted;
>
> (8) to dismiss actions involuntarily; and
>
> (9) applications for post-trial relief made by individuals convicted of criminal offenses.

Pursuant to § 636(b)(1)(B) and (C), the magistrate judge will conduct any necessary hearings and will file and serve a report and recommendation setting forth his proposed findings of fact and recommended disposition of each motion.

Any party may object to the magistrate judge's findings of fact and recommended disposition by filing and serving written objections not later than the date specified by the court in the report and recommendation. Any written objection must identify specifically all proposed findings of fact and all proposed conclusions of law to which the party objects and must set forth

with particularity the bases for these objections.  An objecting party shall serve and file a copy of the transcript of those portions of any evidentiary hearing relevant to the proposed findings or conclusions to which that party is objection.  Upon a party's showing of good cause, the district judge or magistrate judge may extend the deadline for filing and serving objections.

After the time to object has passed, the clerk of court shall transmit to the district judge the magistrate judge's report and recommendation along with any objections to it.

The district judge shall review de novo those portions of the report and recommendation to which a party objects.  The district judge, in his or her discretion, may review portions of the report and recommendation to which there is no objection.  The district judge may accept, reject or modify, in whole or in part, the magistrate judge's proposed findings and conclusions.  The district judge, in his or her discretion, may conduct a hearing, receive additional evidence, recall witnesses, recommit the matter to the magistrate judge, or make a determination based on the record developed before the magistrate judge.

**NOTE WELL: A party's failure to file timely, specific objections to the magistrate's proposed findings of fact and conclusions of law constitutes waiver of that party's right to appeal to the United States Court of Appeals.  *See United States v. Hall,* 462 F.3d 684, 688 (7th Cir. 2006).**